[No. 12885-7-III.   Division Three.   November 15, 1994.]

THE STATE OF WASHINGTON, *Respondent*, v. ROBERT PEPIN, *Appellant*.

*Ellen E. Nolan*, for appellant.

*Gary A. Riesen, Prosecuting Attorney*, for respondent.

MUNSON, J. — Robert Pepin appeals the order denying final discharge, pursuant to RCW 10.77.200, contending the State failed to present sufficient evidence to support the court's conclusion he presents a substantial likelihood of committing felonious acts jeopardizing public safety.

In 1963 Mr. Pepin was hearing voices. For over a month, the voices told him to shoot his brother-in-law, so he did it. He was found not guilty of murder by reason of insanity.

Mr. Pepin was diagnosed as having paranoid schizophrenia. He has been receiving injections of Prolixin, an antipsychotic drug. He was conditionally released from the hospital in 1981. *See* RCW 10.77.190. According to a forensic therapist at Eastern State Hospital,. he had adjusted to the community.

In 1990, after Mr. Pepin's Prolixin dosage had been reduced, there were several incidents in which he engaged in unusual behavior. On one occasion he was yelling and swearing in the bathroom and later claimed he was just praying. There was also an incident in which he was accused of shoplifting and became angry and uncooperative. His dosage was increased to its present level and there were no further strange episodes.

At the hearing on Mr. Pepin's request for final discharge, the court heard testimony from John Niccolls, a forensic

therapist at Eastern State Hospital; Laura Calderwood, Mr. Pepin's treating psychiatrist; Thomas Saltrup, forensic therapist supervisor; community corrections officer Tim Foley; and Mr. Pepin himself. According to Mr. Niccolls, Mr. Saltrup, and Dr. Calderwood, if Mr. Pepin did not receive his medication he would be likely to have recurring symptoms and become dangerous.

Dr. Calderwood testified Mr. Pepin had recently become unusually angry when he asked her to decrease his medication and she declined to do so. She indicated that he said he wanted to stop taking medication and does not believe he has an illness. Mr. Foley testified Mr. Pepin said on numerous occasions that he would like to get off medication and does not believe he has a mental illness. Mr. Pepin said if discharged he would continue to take his medication.

Mr. Pepin contends the evidence did not support the court's decision to deny his request for final discharge. Procedures governing his discharge are based on former RCW 10.77.200:

> (1) Upon application by the committed or conditionally released person, the secretary shall determine whether or not reasonable grounds exist for final discharge. If the secretary approves the final discharge he or she then shall authorize said person to petition the court.
>
> . . . .
>
> (3) Nothing contained in this chapter shall prohibit the patient from petitioning the court for final discharge or conditional release from the institution in which he or she is committed. The issue to be determined on such proceeding is whether the petitioner is a substantial danger to other persons, or presents a substantial likelihood of committing felonious acts jeopardizing public safety or security, unless kept under further control by the court or other persons or institutions.

██ When the State opposes a petition for final discharge recommended by the Secretary, it must show, by a preponderance of the evidence, the petitioner's danger to society. *State v. Paul*, 64 Wn. App. 801, 806-07, 828 P.2d 594 (1992); *see State v. Kolocotronis*, 34 Wn. App. 613, 663 P.2d 1360, *review denied*, 100 Wn.2d 1014 (1983).

> [E]vidence is said to preponderate when the trial court reasonably finds it to be the most credible. *Annest v. Annest*, 49 Wn.2d 62, 298 P.2d 483 (1956).
>
> There can be substantial evidence to both prove and disprove a point. The evidence must be weighed to ascertain which preponderates whenever a burden of persuasion requires the preponderance of evidence test.

(Footnote omitted.) *Paul*, at 807. In the context of commitment of the criminally insane the court recognizes "[w]e are dealing with a most imprecise area of human behavior and we are attempting to predict future conduct of a particular individual." *State v. Wilcox*, 92 Wn.2d 610, 613, 600 P.2d 561 (1979). Unlike *Paul*, Mr. Pepin does not have the Secretary's recommendation for discharge.

Although Mr. Pepin testified he would continue taking his medication, the State presented testimony that several times Mr. Pepin had asked to have his medication reduced or discontinued; he did not believe he was mentally ill; when his medication was reduced he experienced increased symptoms of illness; and if he discontinued medication he would be a substantial danger. The court was entitled to weigh all the evidence in determining whether Mr. Pepin might decide to reduce his medication and thereby become a substantial danger to others.

Mr. Pepin contends the burden of proof should be on the State, contrary to the statute, because he is now required to prove a negative. We disagree. Unlike *Paul*, the Secretary did not agree with Mr. Pepin. If Mr. Pepin could have produced witnesses to support his contention, other than himself, perhaps he could have carried his burden.

He argues failure to grant his request for discharge violates due process and equal protection, citing *Foucha v. Louisiana*, 504 U.S. 71, 118 L. Ed. 2d 437, 112 S. Ct. 1780 (1992) for violation of due process and equal protection. The Supreme Court held Mr. Foucha's continued detention was unlawful once the sanity commission reported he had recovered from a temporary drug-induced psychosis. *Foucha* is distinguishable, first because Mr. Foucha was institutionalized whereas Mr. Pepin has been living in the community

since his conditional discharge 15 years ago. And second, Mr. Foucha's insanity was caused by drugs. Once he ceased taking drugs, his insanity disappeared. Here, there was testimony Mr. Pepin continued to suffer from mental illness and continued to pose a danger unless he took his medication. He has demonstrated that by killing his brother-in-law when "voices" told him to do it. The testimony was that he is diagnosed as a paranoid schizophrenic and will probably never be cured.

Mr. Pepin's request was denied by the trial court and we affirm.

THOMPSON, C.J., and GROSSE, J., concur.