[No. 42413-1-I.   Division One.   September 20, 1999.]

THE STATE OF WASHINGTON, *Respondent*, v. DANIEL GORDON PLATT, *Appellant*.

*Jason Brett Saunders*, for appellant.

*James H. Krider, Prosecuting Attorney*, and *Seth Aaron Fine, Deputy*, for respondent.

AGID, J. — Daniel Platt appeals the trial court's order denying his petition for conditional release from Western State Hospital after he was found not guilty by reason of insanity. Although the issues Platt raises are technically moot because he has now been released, we will decide one of them. The question of which party bears the burden of proving that a petitioner may be conditionally released is an issue of public interest which is likely to recur.[1] We hold that where the Department of Social and Health Services (DSHS) opposes release, the only logical way to read the statute is to put that burden on the petitioner. As the facts of this case illustrate, the petitioner's cooperation is essential if the court is to accurately determine whether he has a mental illness that makes it dangerous for him to be in the community. To place the burden of proof on the State would encourage petitioners to refuse cooperation so that the State could not meet its burden and deprive the trial court of a reliable basis on which to make the release decision.

---

[1]Platt also argues that the trial court violated his due process rights when it denied his motion for conditional release. We do not reach the issue in part because Platt's intransigence resulted in an inability to develop the record fully. Due process challenges that do not involve the First Amendment are reviewed "as applied." *See In re Dependency of C.B.*, 79 Wn. App. 686, 689, 904 P.2d 1171 (1995), *review denied*, 128 Wn.2d 1023 (1996). Thus, without a fully developed record, we are unable to assess Platt's due process claim. We decline to review the equal protection challenge because the claim is moot.

On August 29, 1994, Platt was found not guilty by reason of insanity of attempting to elude a pursuing police officer and released on various conditions governing his conduct. On June 9, 1995, the trial court found that Platt had violated the terms of his release by failing to continue in treatment and threatening his therapist, and sent him to Western State Hospital for a 180-day treatment and observation period. The trial court again ordered his conditional release on December 8, 1995, requiring that he continue with his treatment program, take all prescribed medications and submit to the supervision of the Department of Corrections.

On January 11, 1996, the State requested a bench warrant for Platt because he was no longer taking his medications or going to mental health treatment sessions. The State alleged that Platt had repeatedly threatened his family and neighbors, at one point saying he would use an Uzi and an AK-47, and "it would all end there." It also claimed that he had become delusional, saying he was hiding "in a government witness protection program" and insisting that his deceased wife was still alive. On January 26, 1996, the trial court modified Platt's conditions of release but allowed him to remain in the community.

On June 27, 1997, the State again moved to revoke Platt's conditional release because his condition had seriously deteriorated. The court granted the motion and sent Platt to Western State Hospital for a 15-day evaluation period. After he returned from Western State, the court held a hearing on July 11, 1997, to review whether to again conditionally release him.

The trial court made a number of findings about Platt's behavior while on conditional release. He had worked as a licensed pharmacist in December 1996, but the Department of Health, Board of Pharmacy received several complaints about his job performance, including incorrect labeling and filling of prescriptions. An investigator who interviewed him noted that Platt's speech was incoherent and slurred and his explanations for the errors made no

sense. During the interview, Platt agreed to have his license suspended and obtain a psychiatric evaluation. He failed to obtain the evaluation in January 1997 or to comply with orders from the Board of Pharmacy that he be evaluated as soon as possible. In March and April 1997 he failed to report as scheduled to his community corrections officer (CCO). On March 31, 1997, he contacted his CCO by fax and told him he was working for a company called Rx Relief in Spokane and Pullman. In April 1997 Platt went to California, without his CCO's permission, to work as a pharmacist. After complaints were made about his job performance there, he resigned. In discussions with both the Board investigator and the staff at Western State, Platt denied that there was anything wrong with his job performance when he worked as a pharmacist.

The court concluded that Platt "had explanations for his conduct which upon investigation have turned out not to be true" and that:

> The Senior Staff at Western State Hospital has not been able to complete an evaluation and make a recommendation to the court regarding the defendant['] s current mental status and his likelihood to commit similar felonious acts. . . . More psychological testing is required.

Because Platt's "conduct in the work place and his perceptions of reality in contrast with reports from reliable sources make him a danger to himself or the community," the court ordered further psychological testing. It revoked Platt's conditional release "until the Senior Staff at Western State Hospital can determine he is safe to be in the community."

The trial court heard Platt's third motion for conditional release on January 14 and 21, 1998. As an initial matter, it ruled that Platt had the burden of proving his mental fitness. Dr. Daisuke Nakashima and Social Worker Jackie Cranfill from Western State both testified. Dr. Nakashima's staff administered several psychological tests which appeared to establish that Platt had personality disorders

rather than a mental illness. But Dr. Nakashima also determined that Platt was "more vulnerable to having psychotic episodes" and there "is an increase, a propensity for periods of confusion." He believed that Platt's guarded replies to the evaluation could be evidence of a "lesser degree" psychosis for which further evaluation was necessary. Although the doctors said that Platt displayed "no evidence of any active major psychiatric disorder," it was difficult to determine his current mental state because he refused to "disclose any relevant information about himself, his illness, or on-going problems." Cranfill testified that this "created a classic 'catch-22' situation; by not talking he protects himself from further potential legal problems, but at the same time he has prevented any productive evaluation and treatment regarding his mental illness from taking place."[2] Based on their observations and evaluation of Platt, Western State personnel recommended against conditional release.

Platt's expert, Dr. Lee Gustafson, said Platt's psychotic episode, during which he attempted to elude a police officer, was probably due to sleep deprivation and alcohol abuse rather than a "chronic, recurrent mental condition." The doctor also said that Platt's diagnosis was "atypical psychosis that is recurrent," which means that his mental condition does not fall in the traditional categories of known mental disfunctions. He believed that as of January 1998, Platt had not experienced "any symptoms of a mental illness" for over two years, but admitted that Platt had also denied some psychotic episodes that had occurred. During the interviews with his own expert, Platt was also "very careful in his presentation to me, . . . I think he

---

[2]One of the principal means of determining the mental functioning of a patient is to see if the patient makes overt psychotic or delusional statements in conversation. Cranfill testified that there were no overt signs of improper mental function. "[T]here was no indication of any delusions or hallucinations. The conversations we had appeared to be reality-based. . . . [H]e just displayed no psychotic behavior and gave no indication of any acute psychosis." But because Platt intentionally avoided various topics and was guarded during the evaluation process, the staff thought he might be successfully concealing delusional or psychotic processes.

screened the information that he gave me carefully. I would have characterized him as fairly guarded and not self-revealing." Dr. Gustafson agreed that unless Platt discussed topics that would reveal his delusional thinking, it was difficult to determine whether he was mentally ill. He, too, thought more information was necessary to properly diagnose Platt's mental disorder.

The trial court denied the motion for conditional release. It was particularly concerned about Platt's decisions not to participate fully with the evaluation process. The court found that:

6. Although Mr. Platt participated in the process of the evaluation he did not cooperate with the substance of the evaluation. During the course of the evaluation Mr. Platt remained guarded and would not provide information necessary to the evaluation. For example, Mr. Platt stated because he had a pending bankruptcy and child custody matter he could not discuss personal information with the staff at Western State Hospital. Personal information about Mr. Platt is necessary in order to perform an accurate risk assessment of him. However whenever Mr. Platt was asked a question regarding pertinent information to the evaluation which he did not wish to answer he would often revert to talking about the bankruptcy.

7. In order to gain further information about Mr. Platt he was asked to perform several forensic psychological tests. Those tests were performed by Dr. Karen Franklin, Ph.D. and reviewed by her supervisor, Dr. Daisuke Nakashima, Ph.D. Mr. Platt continued to be guarded in his response to test questions.

8. The results of the psychological test[s] indicated that in part Mr. Platt's guarded responses and refusal to provide relevant information was intentional.

9. Mr. Platt is more likely to be dangerous if conditionally released in the community because of his lack of candor regarding himself and inability to recognize major problems in his life and deal with them appropriately. The likelihood of future psychotic episodes is greater because Mr. Platt is unwilling to recognize major stressors in his life and deal appropriately with those stressors.

10. The Senior Staff at Western State Hospital was unable to make an accurate risk assessment to conditionally release Mr. Platt into the community because of his lack of cooperation with the evaluation process. The Senior Staff did not recommend Mr. Platt's release from Western State Hospital.

The court concluded that Platt had not met his burden of proof.

Platt filed his notice of appeal on March 19, 1998. On October 23, 1998, the trial court granted Platt's petition for conditional release. Both parties ask us to consider the merits of the case even though the issue of Platt's release is moot.

## DISCUSSION

■ If a court can no longer provide effective relief to the parties, the case is moot,[3] and this case is technically moot because Platt has been conditionally released. But a reviewing court will reach issues in a moot case where the same issue is likely to recur and there is a public interest in the controversy.[4] Where the issue is due process rights, we have held that there is sufficient public interest to review it.[5] We agree with the parties that the question of which party bears the burden of proof on the issue of mental illness when the Department opposes conditional release is a matter of public interest that is likely to recur.

■ Petitions for conditional release are governed by RCW 10.77.150 and 10.77.200. At the time of these proceedings, RCW 10.77.150(2) stated:

The court of the county which ordered the person's commitment, upon receipt of an application for conditional release with the secretary's [of DSHS] recommendation for conditional release, shall within thirty days schedule a hearing. The court may schedule a hearing on applications recommended for dis-

---

[3]*In re Detention of Swanson*, 115 Wn.2d 21, 24, 793 P.2d 962, 804 P.2d 1 (1990).

[4]*DeFunis v. Odegaard*, 84 Wn.2d 617, 627, 529 P.2d 438 (1974).

[5]*In re Marriage of T*, 68 Wn. App. 329, 336, 842 P.2d 1010 (1993).

approval by the secretary. . . . The issue to be determined at such a hearing is whether or not the person may be released conditionally without substantial danger to other persons, or substantial likelihood of committing felonious[6] acts jeopardizing public safety or security. The court, after the hearing, shall rule on the secretary's recommendations, and if it disapproves of conditional release, may do so only on the basis of substantial evidence.[7]

RCW 10.77.200 primarily deals with final discharge. It does, however, contain one provision addressing conditional release petitions submitted without the Department's approval. In 1997 and 1998, the statute stated:

(1) Upon application by the committed or conditionally released person, the secretary shall determine whether or not reasonable grounds exist for *final discharge*. . . . If the secretary [of DSHS] approves the final discharge he or she then shall authorize said person to petition the court.

(2) The petition shall be served upon the court and the prosecuting attorney. The court, upon receipt of the petition for final discharge, shall within forty-five days order a hearing. . . . The burden of proof shall be upon the petitioner to show by a preponderance of the evidence that the petitioner no longer presents, as a result of a mental disease or defect, a substantial danger to other persons, or a substantial likelihood of committing felonious acts jeopardizing public safety or security, unless kept under further control by the court or other persons or institutions.

(3) Nothing contained in this chapter shall prohibit the patient from petitioning the court for final discharge or *conditional release* from the institution in which he or she is committed. The issue to be determined on such proceeding is whether the petitioner, as a result of a mental disease or defect, is a substantial danger to other persons, or presents a substantial likelihood of committing felonious acts jeopardiz-

[6]A later amendment changed the word "felonious" to "criminal." LAWS OF 1998, ch. 297, § 41.

[7]LAWS OF 1993, ch. 31, § 6.

ing public safety or security, unless kept under further control by the court or other persons or institutions.[8]

The statute does not specify who has the burden of proof when a person seeks conditional release against the Department's recommendation. Nor does case law provide any clear answer to this question.

One aspect of the question was discussed by the Supreme Court in *State v. McCarter*,[9] a case involving a petition for release brought by a person who was detained under the former sexual psychopathy statute, RCW 71.06. Since that statute did not specify the burden of proof, the court construed it by analogy to RCW 10.77, concluding:

> [t]he respective burdens of proof required for release of the mentally ill are as follows: If a patient was civilly committed, the *State* must prove continued dangerousness by clear, cogent and convincing evidence. If the patient was committed after acquittal of a criminal charge by reason of insanity, the *defendant* must prove that he is safe to be at large by a preponderance of the evidence.[10]

But in determining the burden of proof, the *McCarter* court did not distinguish between conditional release and final discharge or discuss the role of the Department's recommendation.

We discussed the issue in *State v. Kolocotronis*[11] where we stated generally: "A person who has been acquitted by reason of insanity and who seeks release from a hospital has the burden of proving by a preponderance of the evidence that he or she is safe to be at large."[12] This burden of proof applied whether or not the Department recommended

---

[8]Laws of 1993, ch. 31, § 11 (emphasis added). Again, a later amendment changed the word "felonious" to "criminal" in both subdivisions (2) and (3). Laws of 1998, ch. 297, § 44.

[9]91 Wn.2d 249, 588 P.2d 745 (1978).

[10]*Id.* at 254-55.

[11]27 Wn. App. 883, 620 P.2d 546 (1980) (*Kolocotronis* I).

[12]*Id.* at 885.

release.[13] In a second appeal in the same case (*Kolocotronis II*), we said in dicta that the same procedure applied to petitions for conditional release.[14]

Division Three partially disapproved of this dictum in *State v. Paul*.[15] That case involved a petition for *conditional release* which was *supported* by the Department but opposed by the State. The appeal was decided without benefit of a brief from the State. The court held: "As applied to this appeal, both parties bear a burden of producing substantial evidence regarding the petitioner's danger to society."[16] As for the burden of persuasion, the court held that it rests on the State whenever it opposes the Department's recommendation. It derived this requirement from language in RCW 10.77.150(2): "The court . . . shall rule on the secretary's recommendations, and if it disapproves of conditional release, may do so only on the basis of substantial evidence."

The next case to consider this issue again came from Division Three. *State v. Pepin*[17] involved a petition for *final discharge* which the Department opposed. The court held that the defendant bore the burden of proof.[18] Citing *Paul*, the court said in dicta that the State would bear the burden of proof if the Department *supported* a petition for *final discharge*.[19] This is an inaccurate characterization of *Paul*, which actually dealt with *conditional release*. It also appears to conflict with RCW 10.77.200(2) which specifically places the burden of proof on the petitioner, even when the petition for discharge is supported by the Department.

The final case dealing with the issue, also from Division

[13]*Id.* at 887-88.

[14]*State v. Kolocotronis*, 34 Wn. App. 613, 623-24, 663 P.2d 1360, *review denied*, 100 Wn.2d 1014 (1983) (*Kolocotronis* II).

[15]64 Wn. App. 801, 828 P.2d 594 (1992).

[16]*Id.* at 806.

[17]76 Wn. App. 196, 883 P.2d 934 (1994).

[18]*Id.* at 199.

[19]*Id.* at 198.

Three, is *State v. Sommerville*.[20] That case involved an application for *conditional release* which, like the one in *Pepin*, was *opposed* by the Department. The decision does not specifically address the burden of proof but, citing *Paul*, the court said: "Where the State opposes an application for conditional release, it must introduce substantial evidence the petitioner poses a danger to the public."[21] The *Sommerville* court failed to recognize the distinction made in *Paul* between petitions that are supported by the Department and those it opposes.

These decisions demonstrate the high degree of confusion among the courts on the burden of proof. Division Three rejected our dicta in *Kolocotronis* II in its later cases. *Paul* ignored statutory language dealing with the burden of proof on final discharge. The distinction between petitions supported and opposed by the Department considered critical in *Paul* and *Pepin* was disregarded in *Sommerville*. And the distinction between conditional release and final discharge was considered critical in *Paul* but disregarded in *Kolocotronis* II and *Pepin*.

To resolve this confusion, we begin with the statutory language. RCW 10.77.200(3) discusses, in a single sentence, petitions for final discharge and conditional release that are brought *without* the Department's approval. Earlier in the same section, the statute imposes on the defendant the burden of proof for final discharge petitions brought *with* the Department's approval. RCW 10.77.200(2). The Legislature could not have intended that it be easier for the defendant to obtain a discharge *without* the Department's approval than *with* it. Since the statute covers final discharge and conditional release in the same sentence, the burden of proof for conditional release must likewise be placed on the defendant, so long as the Department does not concur.

This holding reconciles almost all of the cases. It is consistent with *McCarter, Kolocotronis* I and *Kolocotronis* II,

---

[20] 86 Wn. App. 700, 937 P.2d 1317, *review denied*, 133 Wn.2d 1023 (1997).

[21] *Id*. at 707.

*Paul* and *Pepin*. It is arguably inconsistent with the dictum in *Sommerville*, but that statement reflects a misreading of *Paul*.

This holding also reflects the policy underlying commitment of persons acquitted by reason of insanity:

> Those subject to criminal commitment have been found beyond a reasonable doubt to have committed an act which, except for their insanity, would have been a criminal act subjecting them to criminal penalties. . . . [P]ast conduct is heavily indicative of the likelihood that a person will commit similar acts which will again endanger others. Therefore, it is logical that those who have reached the attention of the State because of serious antisocial acts, would be subject to more procedural burdens in obtaining their release than are those whose acts are less threatening to the public safety.[22]

When a person has been acquitted by reason of insanity, it is logical for the Legislature to infer that he continues to have a mental illness that makes him dangerous until the Department and/or the court conclude otherwise.[23]

Practical considerations also support this allocation of the burden of proof. Medical professionals cannot do a thorough, reliable examination of a person's mental state without that person's cooperation. If the State had the burden of proof, an insanity acquittee could refuse to participate in testing, prevent the State from obtaining critical information about his mental health, and then seek release because the State cannot prove that he is mentally ill. As the facts recited above demonstrate, that is what happened here. The trial court found that an accurate risk assessment was impossible because of Platt's lack of cooperation.

Finally, Platt claims that putting the burden of proof on

---

[22]*Alter v. Morris*, 85 Wn.2d 414, 420, 536 P.2d 630 (1975).

[23]*Jones v. United States*, 463 U.S. 354, 363-66, 103 S. Ct. 3043, 77 L. Ed. 2d 694 (1983); *but see Sommerville*, 86 Wn. App. at 710 (inference does not last indefinitely).

the defendant is contrary to *Foucha v. Louisiana.*[24] We disagree. The plurality opinion in *Foucha* held it was improper to detain an insanity acquittee who is *not* mentally ill simply because he is dangerous.[25] The State had conceded that Foucha was no longer mentally ill,[26] so there was no need to address the question of who had the burden of proving mental illness. Since *Foucha*, numerous courts have upheld statutes that impose on defendants the burden of proof in release proceedings.[27] Because the Washington statute requires a finding that the defendant has a mental illness that causes him to be dangerous as a prerequisite to denying release, it does not run afoul of *Foucha*.

Despite the confusion reflected in earlier cases on the issue, the statutory language and the practical considerations discussed above make it clear that the trial court properly placed the burden of proving lack of mental illness on the defendant where the Department opposes his petition for conditional release.

Affirmed.

KENNEDY, C.J., and GROSSE, J., concur.

Review granted at 140 Wn.2d 1005 (2000).

---

[24]504 U.S. 71, 112 S. Ct. 1780, 118 L. Ed. 2d 437 (1992).

[25]*Id.* at 83.

[26]*Id.* at 78.

[27]*State v. Miller,* 84 Haw. 269, 933 P.2d 606, 610-12 (1997); *People v. Sword,* 29 Cal. App. 4th 614, 34 Cal. Rptr. 2d 810, 814-16 (1994), *cert. denied,* 514 U.S. 1117 (1995); *State v. Tooley,* 875 S.W.2d 110, 113-14 (Mo. 1994); *Hearne v. United States,* 631 A.2d 52 (D.C. 1993); *Nagel v. State,* 262 Ga. 888, 427 S.E.2d 490, 491-92 (1993); *see Nagel v. Osborne,* 164 F.3d 582 (11th Cir. 1999) (upholding presumption of continuing insanity under Georgia statute).